IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AUSTIN LEGAL VIDEO, LLC, | § | |
| DEPO-NOTES, LLC, and PASQUAL | § | |
| PEREZ, III, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Case No. 1:23-CV-00421-DAE |
| | § | |
| DEPOSITION SOLUTIONS, LLC | § | |
| D/B/A LEXITAS, COURT REPORTERS | § | |
| CLEARINGHOUSE, INC., ALDERSON | § | |
| REPORTING COMPANY, INC., | § | |
| SOUTHWEST REPORTING & VIDEO | § | |
| SERVICE, INC., KENNEDY | § | |
| REPORTING SERVICE, INC., TEXAS | § | |
| COURT REPORTERS ASSOCIATION, | § | |
| INC., SPEECH TO TEXT INSTITUTE, | § | |
| INC., SHERRI FISHER, LORRIE | § | |
| SCHNOOR, SONIA TREVINO, AND | § | |
| SHELLY TUCKER, | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S RESPONSE TO ALDERSON'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Austin Legal Video, LLC, Depo-Notes, LLC, and Pasqual Perez, III respectfully submit this response to Defendant Alderson Court Reporting Company, Inc.'s ("ARC") Amended Motion for Summary Judgment ("Motion") Plaintiffs' Amended Complaint ("Complaint").

## INTRODUCTION[1]

This antitrust action arises out of a group boycott by certain court reporting firms. Plaintiff Pasqual Perez created a software called Depo-Notes to provide speech-to-text transcription in depositions. The goal was to reduce costs and bring new technology to an industry suffering from high prices and a chronic shortage of court reporters. The Defendant court reporters didn't like this. It cut into their business model. So they blackballed Mr. Perez, launching a group boycott of not only Mr. Perez's new company, Depo-Notes, but also his existing videography company, Austin Legal Video. The goal, as the former president of the National Court Reporters Association (NCRA) put it, was to "fend off the attack by the barbarians."

Astoundingly, some of the story is contained in emails, texts, and social media posts. For example, a court reporter working for Lexitas wrote to Mr. Perez that "I bet you would be welcomed back into the reporting community if you would just let the stupid software go. . . . Imagine how peaceful your life would be," and "[i]t is my understanding you are being blackballed." Another asked Mr. Perez to stop marketing the product after an "immense backlash" from court reporters who are "very much against your product," and confirmed that a boycott was in place. Others filed a baseless complaint against Mr. Perez with the Texas Judicial Branch

---

[1] Before the Court are four motions to dismiss and one motion for summary judgment. Although the arguments differ, the facts are pled to show the group boycott as a whole. Accordingly, the response briefs are similar in places. Specifically, the Introduction and Background sections are similar in each response (although the Background length differs). The Summary of Argument and Argument & Authorities sections differ. The subsections discussing direct and indirect evidence of antitrust violations are similar.

Certification Commission and engaged in online media attacks to pressure Depo-Notes and Austin Legal Video to pull-down their product.

As a consequence of this illegal boycott, Mr. Perez's business was devastated. In addition to blackballing Depo-Notes, Defendants also destroyed Austin Legal Video, the videography business that Mr. Perez had run for many years, causing his work to dry up almost completely. And worse, Defendants prevented the nascent Depo-Notes from ever coming to market.

## SUMMARY OF ARGUMENT

Unlike the other Defendants, who argue that Plaintiffs' claims have no basis in law, ARC argues that they have no basis in fact. In support, ARC submits a declaration stating that it did not communicate with the other Defendants regarding Depo-Notes, and ceased doing business with Plaintiffs for other reasons. However, Plaintiffs dispute these facts, and are not required to take ARC's word for them. ARC cannot simply short-circuit the judicial process by presenting its own side of the story by declaration and moving for summary judgment before discovery has even begun. *See George v. Go Frac, LLC*, No. SA:15-CV-943, 2016 WL 94146, at *4 (W.D. Tex. Jan. 7, 2016) (summary judgment motion premature before discovery).

Discovery is particularly important in this case. As the Fifth Circuit has observed, "[e]ven a successful antitrust plaintiff will seldom be able to offer direct evidence of a conspiracy and such evidence is not a requirement." *General Chemicals, Inc. v. Exxon Chemical Co.*, 625 F.2d 1231, 1233 (5th Cir. 1980) (citation omitted). Although ARC argues that there is no direct evidence against it specifically, given the entire gravamen of this group boycott action, there is a genuine issue of material fact as to whether ARC was involved. In Under Fifth Circuit law, it would be extremely unusual for the Court to grant summary judgment in this well-pled antitrust case prior to any discovery whatsoever, and the Court should deny the attempt.

## BACKGROUND

Plaintiff Pasqual Perez, III is the owner of Depo-Notes and Austin Legal Video. Prior to starting Depo-Notes, Mr. Perez had been a successful legal videographer for over twenty-five years. He founded Austin Legal Video in 2014. Austin Legal Video did a thriving business, and had a number of employees, including videographers, an office manager, and IT personnel. Most of Austin Legal Video's revenue came from large national or regional Litigation Support Firms, including Defendants. Its biggest client was Lexitas.

In early 2019, Mr. Perez began developing and pitching the Depo-Notes software. Depo-Notes is a voice recognition software that aimed to provide innovative and necessary recordings for depositions and other legal proceedings. Typically, depositions are recorded by court reporters, who attend the entire proceeding and take down what was said. Depo-Notes aimed to change that by offering Speech-To-Text (STT) technology to convert a video recording of a deposition into a rough transcript complete with a word index and links back to the video. The product was intended to ease the chronic shortage of court reporters in the industry[2] and also significantly reduce deposition costs.

As Mr. Perez tried to introduce Depo-Notes throughout the year of 2019, his business suffered. His clients stopped calling him. His depositions were cancelled. Business steadily dropped, in some cases by as much as three-quarters from 2018 and 2019. In 2020, he was almost completely dropped by his largest client, Lexitas. The boycott was explicitly stated by one court reporter working for Lexitas. On November 30, 2019, Shelly Tucker, a court reporter working for Lexitas, wrote in an email that:

> **It is my understanding you are being blackballed.**  Is what you hope to profit from this technology going to be worth what you lose in other business?  From a

---

[2]   https://www.ncra.org/docs/default-source/uploadedfiles/education/schools/2013-14_ncra_-industry_outlook-(ducker)8ef018c4b8ea486e9f8638864df79109.pdf?sfvrsn=c7a531e2_0.

> reporter perspective, you have essentially created technology to prove that court reporters aren't needed. . . . **The reason you only have one reporter agreeing to certify your transcript is because the rest of us know we will be blackballed if we agree to help you.** . . . It would have to be significant page rate for me to risk being blackballed in this small community. **You can drop this whole idea and get your business back** or you can walk away from reporters and continue this new direction.

Complaint at ¶ 46.[3] This was confirmed by a January 12, 2020 from Bo Davis, a regional director at Lexitas, advising that they were witnessing an "immense backlash" from the court reporters regarding this product and requesting that Austin Legal Video cease marketing the product:

> I am becoming very concerned as there has been an **immense backlash** on social media regarding your product. **The reporters are very much against your product and it is filtering into agencies which utilize your services, etc.**
>
> You and your team are a valuable asset to us and I want to continue our relationship, but **I need you and your team not to continue to advertise your product directly to our court reporters**. I know what you are trying to do and I don't discount your product at all, but **I am feeling that this could cause a backlash from our reporters which could cause them to no longer wish to cover work from our firm if they have a sense that we are looking to put them out of business**.

Complaint at ¶ 47. On February 3, 2020, Shelly Tucker, the court reporter for Lexitas, wrote that "**I bet you would be welcomed back in the reporting community if you would just let the stupid software go** but for some reason you just wont let it go. **Imagine how peaceful your life would be if you would just let it go.**" *Id.* In the wake of the boycott, Mr. Perez and his companies were almost entirely shut out of the business he had worked in for most of his adult life.

Plaintiffs' revenue numbers reflect the boycott. For instance, from 2018 to 2019—2019 being the year that Plaintiffs released and began marketing Depo-Notes—business dropped by approximately 75% from CRC, 76% from Alderson, and 84% from Southwest. Business from Lexitas, which began boycotting Plaintiffs at the end of 2019, dropped by 80% in 2020. Complaint

---

[3] All citations to the Complaint refer to the Amended Complaint, which is incorporated as though fully set forth herein.

at ¶ 12-16. This was similar to declines from the other court reporting companies Plaintiffs worked with. Today, Plaintiffs' revenue from Austin Legal Video is close to zero.[4] *Id.* at ¶ 16.

## LEGAL STANDARD

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 248(1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55. *See also Univ. Loft Co. v. Blue Furniture Sols., LLC*, No. A-15-CV-826 LY, at *3 (W.D. Tex. Mar. 3, 2017).

## ARGUMENT & AUTHORITIES

### I.     ARC Is Not Entitled To Summary Judgment On Plaintiffs' Antitrust Claim.

#### A.     Summary Judgment Is Not Appropriate Prior To Discovery.

This Court has held that "[a] grant of summary judgment is premature and improper when basic discovery has not been completed, particularly when the moving party has exclusive access

---

[4] Additional factual allegations against all defendants are described *infra* rather than repeated here, for the sake of conciseness.

to the evidence necessary to support the nonmoving party's claims." *Phongsavane v. Potter*, Civ. Ac. No. SA-05-CA-0219-XR, 2005 WL 1514091, at *5 (W.D. Tex. June 24, 2005) (citing Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2741 at 412-19 (3d ed. 1998)).[5] In particular, summary judgment procedures "should be used sparingly in complex antitrust litigation where motive and intent play leading roles," *Paul Kadair, Inc. v. Sony Corp. of Am.*, 694 F.2d 1017, 1027 (5th Cir. 1983) (citing *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)).

In *George v. Go Frac, LLC*, Civil Action No. SA-15-CV-943-XR, at *4 (W.D. Tex. Jan. 7, 2016), this Court denied a motion for summary judgment that was filed less than two months after the case was initiated, prior to any scheduling order or initial conference, and before any discovery had begun. *Id.* The Court held that "[g]ranting summary judgment not just before discovery has been completed, but before it has even begun on this issue, would be premature."

---

[5] The Fifth Circuit has explained that "[s]ummary judgment assumes some discovery" *(Brown v. Miss. Valley State Univ.,* 311 F.3d 328, 333 (5th Cir. 2002)), and such motions should not "ordinarily be granted before discovery has been completed." *Ala. Farm Bureau Mut. Cas. Co.. Inc. v. Am. Fid. Life Ins. Co.,* 606 F.2d 602, 609 (5th Cir. 1979); *see F.D.I.C. v. Shrader & York,* 991 F.2d 216, 220 (5th Cir. 1993) ("Summary judgment is appropriate if, *after discovery,* there is no genuine dispute over any material fact."). As a result, courts have denied as premature summary judgment motions filed before the parties have had adequate opportunity to conduct discovery. *See, e.g., Brown,* 311 F.3d at 333-34 (holding district court abused its discretion by declining to rule on plaintiffs request for discovery but then "grant[ing] summary judgment on the grounds that there was insufficient evidence of [defendant's] involvement in a conspiracy, precisely the type of evidence sought by [plaintiff]"); *Cree v. Braco,* No. 2:21-CV-00208, 2022 WL 1379512, at *1 (S.D. Tex. Apr. 6, 2022) (recommending the district judge deny without prejudice as premature plaintiffs summary judgment motion, where defendant had not yet answered and no discovery had taken place), *R. & R. adopted sub nom. Cree v. Collier,* 2022 WL 1321043 (S.D. Tex. May 3, 2022); *Whitfield v. Miss. Bureau of Narcotics,* No. 3:17cv987-HSO-JCG, 2019 WL 6534144, at *4 (S.D. Miss. Dec. 4, 2019) ("Because neither party has had adequate time to complete discovery, [plaintiffs [m]otion for [s]ummary [J]udgment should be denied without prejudice as premature."); *George v. Go Frac, LLC,* No. SA-15-CV-943-XR, 2016 WL 94146, at *3 (W.D. Tex. Jan. 7, 2016) ("Granting summary judgment not just before discovery has been completed, but before it has even begun on this issue, would be premature."). *See also Rogers v. McLane*, Civil Action 5:22-CV-130-BQ, at *4 (N.D. Tex. Nov. 14, 2022).

*Id.* (citing *See Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 354 (5th Cir. 1989) ("Summary judgment should not . . . ordinarily be granted before discovery has been completed.")).

Here, the state of affairs is similar. As in *George*, ARC's motion for summary judgment was filed two months after the initial Complaint (the Complaint was filed on April 17, and ARC's motion on June 20), even as the other defendants filed motions to dismiss. No scheduling order has been issued, and no initial conference has been set. Accordingly, the Court should deny the motion for summary judgment.

The only case that ARC cites where a court granted summary judgment without discovery is *Paul Kadair, Inc. v. Sony Corp. of Am.*, 694 F.2d 1017, 1023 (5th Cir. 1983), in which a plaintiff sued 40 manufacturers under the Sherman Act. However, that case differs because there, the nonmovant failed to controvert the movant's affidavits, failed to present any significant evidence of conspiracy, and admitted that he had no evidence of conspiracy. *Id.* What is more, in that case the nonmovant ***had the opportunity to take discovery***, but was dilatory in doing so, and failed to make timely discovery requests. *Id.* at 1023 & 1028 ("plaintiff has failed to diligently and timely engage in discovery to obtain the necessary information to oppose defendants' motions."). Here, by contrast, Plaintiffs controvert ARC's declaration and present significant evidence of a group boycott by all of the Defendants. And Plaintiffs have had no opportunity to take discovery at all.

**B.      The Facts Are Disputed.**

ARC makes categorical assertions by declaration that "[a]t no point did ARC elect to use or not use Plaintiff Austin Legal Video's (ALV) services due to some voice-to-text product that Perez was developing and/or marketing, *id.* at ¶ 5; that ARC curtailed its use of ALV's services due to the coronavirus pandemic; *id* at ¶ 8; that ARC's new vendor's rate was $10 less than ARC's, which was primary reason for the change; *id.* at ¶ 12-13; and that ARC did not discourage any Texas court reporting companies from doing business with Plaintiffs. *Id.* at ¶ 14.  However, all of

this is controverted, and these statements are entitled to be tested. Plaintiffs need not take ARC's word for it.

ARC avers that they changed videographers because a national vendor was found, with a better price, and because COVID-19 dramatically lowered the demand for depositions. However, the revenue figures tell another story. Plaintiffs have alleged that ARC sent them approximately $3,685 in business in 2016, $5,324 in 2017, and $5,211 in 2018. Complaint at ¶ 15. This dropped to **1,223** in 2019, the year Mr. Perez released and began marketing Depo-Notes. Alderson sent approximately $431 of business in 2020, and $1,357 in 2021. In other words, the steep decline in business happened in 2019, when Plaintiffs began marketing Depo-Notes, not in 2020 (coronavirus) or 2021 (a new videography vendor). So although ARC argues that it continued to do business with Plaintiffs for two years following the introduction of Depo-Notes, Motion at 6, that was at a much lower rate. ARC is entitled to its legal theory, but respectfully, Plaintiffs are entitled to their own as well.

Further, the evidence will show that Alderson had also planned to contract with Depo-Notes to use its new service in or around March 2020. The meeting was later cancelled, due to "certain circumstances," on April 2. The circumstances were never revealed. Complaint at ¶ 15. Plaintiffs allege that was because of the boycott. *Id.* If Alderson has a different argument about why the meeting was cancelled, it may present it, but at this time, all of this is a fact issue.

### C.      Rule 56(d) Is Also Grounds For Denying Summary Judgment.

The Court should also deny summary judgment under Rule 56(d). Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Motions under Rule 56(d) are "broadly favored and

should be liberally granted' because the rule is designed to 'safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (citing *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006)). To obtain relief under Rule 56(d), the nonmovant must demonstrate two things: "1) why he needs additional discovery, and 2) how the additional discovery will likely create a genuine issue of material fact." *Chenevert v. Springer*, 431 F. App'x 284, 287 (5th Cir. 2011) (citing *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 534 (5th Cir. 1999)). Additionally, beyond the protections and requirements of Rule 56(d), in the Fifth Circuit, courts have discretion to deny a motion for summary judgment as premature. *See, e.g., Gabarick v. Laurin Mar. (Am.), Inc.*, 406 F. App'x 883, 890 (5th Cir. 2010).

Here, a genuine issue of material fact exists, and no Rule 56(d) analysis is required. It is patently obvious why additional discovery is needed. Plaintiffs have alleged that ARC boycotted it because of Depo-Notes. Complaint at ¶ 15. To determine the truth of this, Plaintiffs need to question ARC's witnesses and review ARC's documents. Although ARC declares that it never communicated with the other Defendants regarding Depo-Notes, and that it switched to another provider for an alternate reason, that is disputed. That is exactly what discovery is for. *See George*, Civil Action No. SA-15-CV-943-XR (considering a Rule 56(d) declaration in denying the motion for summary judgment).

To the extent that Rule 56(d) consideration is called for, though,[6] Plaintiffs attach a declaration explaining this. Document requests and depositions will allow Plaintiffs to test the

---

[6] Plaintiffs do not believe that the Court needs to reach Rule 56(d) because a genuine dispute of material fact exists. However, to the extent Rule 56(d) is considered, Plaintiffs hereby move for relief under Rule 56(d). This need not be by separate motion. *See Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015) (opposition under Rule 56(d) need not be registered in a motion to the court, but

truth of ARC's contentions, ascertain whether they had communications with the other Defendants about Depo-Notes, and understand why ARC stopped using Plaintiffs' services.

## II.   Plaintiffs Have Plead A Sherman Act Claim.

### A.   Elements Of An Antitrust Claim

A complaint alleging a conspiracy in violation of Section 1 of the Sherman Act must allege that Defendants (1) engaged in a conspiracy, (2) that restrained trade, (3) in the relevant market. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002). A plaintiff must plead factual allegations sufficient for the Court to draw a reasonable inference that Defendants made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 373-74 (5th Cir. 2014) (quotation omitted).

To establish liability under § 1, a plaintiff must show that the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market. *Acad. of Allergy & Asthma in Primary Care & United Biologics, LLC v. Superior Healthplan, Inc*, No. SA17CA1122FBHJB, 2022 WL 18076843, at *13 (W.D. Tex. July 14, 2022)[7] (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001)). Here, Plaintiffs have laid out the factual allegations of a conspiracy that restrained trade in the certified transcripts market and the non-certified transcripts market both locally and nationally.

A plaintiff may prove this agreement by either direct or circumstantial evidence. *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008). In the antitrust conspiracy

---

rather, the Rule allows the court to respond to a Rule 56(d) affidavit or declaration by allowing time to take discovery). However, if a motion is needed, Plaintiffs so move.

[7] Report and recommendation adopted sub nom. *Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*, No. CVSA17CA1122FBHJB, 2022 WL 18034365 (W.D. Tex. Oct. 18, 2022).

context, "[d]irect evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences . . . to support a conspiracy claim." *Id.* (citing *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007)). Direct evidence is unambiguous; it does not require any inference on the part of the factfinder. *In re Pool Prod. Distrib. Mkt. AntitrustLitig.*, 158 F.Supp.3d 544, 550-52 (E.D. La. 2016).

### B.  Direct Evidence

Here, there is significant direct evidence of an illegal group boycott by the Defendants. On November 30, 2019, Shelly Tucker, a court reporter working for Lexitas, wrote in an email that: **"It is my understanding you are being blackballed.** Is what you hope to profit from this technology going to be worth what you lose in other business?  . . . . The reason you only have one reporter agreeing to certify your transcript is because the rest of us know we will be blackballed if we agree to help you. . . .  You can drop this whole idea and get your business back or you can walk away from reporters and continue this new direction." Later, on February 3, 2020, she added that "I bet you would be welcomed back in the reporting community if you would just let the stupid software go but for some reason you just wont let it go. **Imagine how peaceful your life would be if you would just let it go.**" Complaint at ¶ 46.

This was echoed by comments from Lexitas regional director Bo Davis, who wrote Plaintiffs on January 12, 2020 to say: "I am becoming very concerned as there has been an immense backlash on social media regarding your product. The reporters are very much against your product and it is filtering into agencies which utilize your services, etc. . . . I need you and your team not to continue to advertise your product directly to our court reporters. . . . . I am feeling that this could cause a backlash from our reporters which could cause them to no longer wish to cover work from our firm if they have a sense that we are looking to put them out of

business. Complaint at ¶ 47. On January 16, Mr. Perez wrote back "Here's the reporters only solution to the shortage (Let's Blackball Trey and his team)," to which Bo Davis responded "**Yes**, reporters have blinders on right now," confirming the boycott. *Id.* at ¶ 48.

Depo-Notes and Austin Legal Video were not the only targets of the boycotting court reporters. For instance, a colleague of Mr. Perez named Bradley Allen who owned a litigation support firm called Litigation Bids told Mr. Perez on or about October 22, 2020 that the took down an article critical of how court reporters were handling new technology after some court reporters "made some serious threats . . . It's obviously a touchy subject. . . . ." *Id.* at ¶ 49. Stenograph, Inc., the company that supplies court reporters with their stenographic typing device, experienced the ire of the court reporters when it added the image of a sound wave to its logo, conjuring fears of speech-to-text technology taking over the industry. *Id.* Stenograph announced its automatic speech recognition product, Phoenix, around November 2021, by which point Depo-Notes already had a working version of its own software. *Id.*

This sentiment was confirmed by other communications. The President of Defendant CRC, Sherry Schritchfield, wrote in a September 27, 2019 email to Plaintiffs that court reporters were "concerned" about Plaintiffs' proposed rough draft offerings: "As you can imagine, the reporters are seeing that service as direct competition. I would like to hear more about your offering and how you envision the impact on court reporters, if any." *Id.* at ¶ 45.

There is evidence that the boycott even extended to people who had worked with Plaintiffs. Walter Bryan, a videographer who used to work with Plaintiffs, was also boycotted by Lexitas and others. *Id.* When Bryan applied to work with Defendant Southwest on January 6, 2023, Southwest's scheduling coordinator responded with: "I just need to ask, since you were previously

affiliated with Austin Legal Video, are you still working with Trey Perez?" *Id.* at ¶ 16. Only after Bryan confirmed that he was not did he receive consideration for the job.

The Defendant court reporters also used legal and regulatory means to attempt to suppress Depo-Notes new technology. On or about February 5, 2020, the president of the TCRA, Lorrie Schnoor (and the President of Defendant Kennedy Reporting), with support from its members, filed a baseless complaint against Austin Legal Video and Depo-Notes with the Texas Judicial Branch Certification Commission ("JBCC"). *Id.* at ¶ 50. One person with knowledge of the court reporters' efforts described this complaint as the test case the court reporters had been looking for the opportunity to bring for months as part of their coordinated efforts to stop the incursion of STT barbarians. *Id.* The JBCC dismissed the complaint. Despite that, Ms. Schnoor, through her attorney, asked the JBCC for reconsideration of the dismissal. A video of the hearing regarding the request for reconsideration shows that the request was denied a full eight seconds after the moving attorney representing the TCRA completed his argument for reconsideration. *Id.* This was not the only time the court reporters used legal and regulatory means to suppress new technology. Court reporters led by Jo Ann Byles Holmgren filed a complaint with the JBCC against a company called StoryCloud, another company attempting to use STT technology to transcribe depositions. After the complaint, the company later shut down

Depo-Notes was also specifically discussed at a February 23, 2020 meeting of the TCRA in Corpus Christi, wherein Depo-Notes first social media salvo was shown to the members. On information and belief, discussions at the meeting, and surrounding the meeting, furthered the boycott. *Id.* at ¶ 53. Court reporters also discussed Depo-Notes in private Facebook group chats, which Plaintiffs do not have access to. *Id.*

From the day of Depo-Notes birth, the court reporting industry, aided by their trade associations and litigation support firms, have sought to kill this nascent competitor in the crib, along with any other offspring exhibiting similar DNA—or at least, delay its development to forestall this threat to their business. As Steve Townsend, President of the STTI (and former president of the National Court Reporters Association (NCRA) recently observed, the court reporting industry has been engaged in a similar battle for some time now. "New entrants will disrupt the [court reporting] market with new business models. Sometimes the incumbents are able to fend off the attack by the barbarians…." *Id.* at ¶ 30. Defendants' way of "fending off the barbarians" was to blacklist Depo-Notes, and boycott Austin Legal Video, resulting in the closure of these businesses, and ruination of Mr. Perez's livelihood.

Antitrust complaints like Plaintiffs' "that include detailed fact allegations as to the 'who, what, when and where' of the claimed antitrust misconduct not surprisingly survive dismissal." *See Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430, 445 (6th Cir. 2012); *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1048 (9th Cir. 2008). *See also* William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 9:14 (2014 supp.). Now, Plaintiffs bring this antitrust action to hold them accountable.

In addition, the Court should consider the allegations against ARC in the context of the those against all of the Defendants. In *TravelPass Group, LLC v. Caesars Entm't Corp.*, 2019 WL 5691996, at *35 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019), one of the defendants in an antitrust case, Caesars, argued that the complaint contained only a "small handful of allegations" regarding Caesar's individually, and should therefore be dismissed. *Id.* The court rejected this argument, finding that the plaintiffs

had alleged "nonconclusory, substantive allegations directed to all defendants" and "[t]he complaint is not pleaded in entirely general terms without any specification:

> There is no requirement that [Plaintiff] particularly name each defendant as having committed what [Plaintiff] has alleged because that fact is inherent in the allegations made against each defendant; without each defendant (including Choice) fulfilling these specific roles, the conspiracy would have failed as economically impractical for the many reasons included in the complaint. That Choice is not named in certain allegations that apply to certain defendants does not negate the fact that there are numerous core allegations that do apply to each defendant. In viewing the complaint as a whole and taking all allegations as true, the Court cannot say that Plaintiffs have failed to plead enough facts to state a claim for relief against Choice that is plausible on its face. The Court recommends Choice's separate motion to dismiss also be denied.

*Id.* at *37.[8] Likewise here, the significant allegations against all Defendants should be considered in evaluating the allegations against ARC. Here, there are sufficient allegations against all defendants as a whole to support Plaintiffs' claims. Notably, "[e]ven a successful antitrust plaintiff will seldom be able to offer a direct evidence of a conspiracy and such evidence is not a requirement." *General Chemicals, Inc. v. Exxon Chemical Co.*, 625 F.2d 1231, 1233 (5th Cir. 1980) (citation omitted). In fact, this is the rare case in which Plaintiffs have direct evidence against many defendants in this conspiracy. *See id.* ("Rarely, if ever, can a plaintiff point to a `smoking gun' in [conspiracy] cases such as this. Yet, a plaintiff must convince the court that it is reasonable to infer the existence of the gun from the facts shown.").

---

[8] The *TravelPass* court distinguished its facts from this Court's decision in *Wiltfong v. California State Bd. of Accountancy*, 2018 WL 935398 (W.D. Tex. Feb. 16, 2018), which had held that a plaintiff "cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." In *Wiltfong*, a *pro se* plaintiff filed an amended complaint at the court's order, which complaint failed to describe how each of 127 defendants participated in the alleged conspiracy, and only plead in general terms, with the most specific allegation being "that many of the 'members of the cartel' sit on various state regulatory boards and are employed by the 'Big 4' accounting firms." *Id.* at *2. This case is a far cry from *Wiltfong*. Plaintiffs have alleged direct evidence of a group boycott, including with specific statements from a number of the defendants. Plaintiffs have also alleged circumstantial evidence against all of the defendants, showing that they ceased doing business with him around the same time. This is sufficient to survive a motion to dismiss against all defendants.

### C.      Circumstantial Evidence

In addition to the direct evidence, there is circumstantial evidence of parallel conduct against each of the Defendants. An antitrust plaintiff may also rely on circumstantial evidence for proof of an agreement. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002). Such circumstantial evidence must be strong, however, because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Circumstantial evidence must tend to rule out the possibility that the alleged conspirators were acting independently. *See Golden Bridge Tech., Inc.*, 547 F.3d at 270-71. Independent parallel conduct, "or even conduct among competitors that is consciously parallel," cannot on its own establish the requisite illegal agreement. *Id.* at 271 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007))). Neither will conduct that is "consistent with other, equally plausible explanations." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir. 2000) (quoting *Matsushita Elec. Indus. Co*, 475 U.S. at 587)).

Here, the circumstantial evidence of parallel conduct is significant—**all of the Defendant court reporting companies, and most of Plaintiffs' other clients, stopping using Plaintiffs around the same time.** That is, the time of the boycott. The below chart shows revenue figures:

| Lexitas | CRC | Alderson | Southwest |
|---|---|---|---|
| 2016: $41,417 | 2016: $7,000 | 2016: $3,685 | 2016: $11,084 |
| 2017: $44,702 | 2017: $13,441 | 2017: $5,324 | 2017: $11,957 |
| 2018: $119,600 | 2018: $32,413 | 2018: $5,211 | 2018: $25,217 |
| 2019:$151,558 | **2019:$7,914** | **2019: $1,223** | **2019: $4,162** |
| **2020: $32,048** | **2020: $538** | **2020: $431** | **2020: $1,296** |
| **2021: $0** | **2021: $0** | **2021: $1,357** | **2021: $0** |

As the numbers show, the Defendants Southwest, Alderson, and CRC all showed significant drops from 2018 to 2019—2019 being the year that Plaintiffs released and began marketing Depo-Notes.[9] **Business dropped by approximately 75% from CRC, 76% from Alderson, and <u>84% from Southwest</u>**. With respect to Lexitas, the approximately 80% drop happened in 2020—shortly after the November 2019 email from Shelly Tucker, court reporter for Lexitas, and the January 2020 emails with Bo Davis, product manager for Lexitas. This is the type of parallel conduct that suggests that a boycott was the cause of the drop in business. *See Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1009 (N.D. Cal. 2013) ("the Supreme Court has suggested that a complaint should allege "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007)). "In antitrust cases . . . There is no dispute but that uniform business behavior is admissible circumstantial evidence from which the fact finder may infer agreement." *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 303 (5th Cir. 1978) (citations omitted). Plaintiffs expect that Defendants will blame COVID for the drop in business. However, much of the decline occurred in 2019, before COVID, and in any case, it is a fact issue.

In addition to the obvious parallel conduct that the numbers show, the factfinder must also consider certain "plus factors." *See Royal Drug Co., Inc. v. Grp. Life & Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984) (citation omitted).[10] Here, the plus factors point toward a group boycott.

---

[9] These figures are alleged in the Amended Complaint at paragraphs 12-16.

[10] There is no exhaustive list of "plus factors" in the Fifth Circuit, but courts have considered factors including (1) actions that would be against the defendants' self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert; (2) a motive to conspire; (3) opportunities to conspire; (4) market concentration and structure conducive to collusion; (5) pretextual explanations for anticompetitive conduct; (6) sharing of pricing information; (7) signaling among competitors; (8) and other traditional facts suggestive of

Defendants had a clear motive to boycott Plaintiffs—they wished to keep profits high, and court reporters in business. To "fend of the barbarians," in other words. Plaintiffs were proposing to charge roughly $2 to $2.50 per page for transcripts, which was less than half of what traditional court reporters charged. Complaint at ¶ 63. Ceasing to use a reliable partner like Austin Legal Video all at once does not make sense if each Defendant were acting in their individual financial self-interest, but does make sense if they were acting in concert. The Defendants had opportunities to conspire, for example, the February 23, 2020 TCRA meeting, as well as the private Facebook group chats and various other meetings of the court reporters. The market concentration and structure is conducive to collusion, as evidenced by the fact that speech-to-text has made little headway in deposition settings, for instance, even as it has become accepted in many other industries. There are also pretextual explanations for anticompetitive conduct—that is, they simply stopped using Plaintiffs' video services for some other reason, or filed grievances such as the JBCC complaint for alleged violations of laws which were rejected. *See Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745, 752 (10th Cir. 1999) (upholding liability under the Sherman Act where "it is alleged that the archery manufacturers and distributors did not simply switch their business . . . for legitimate business reasons, but did so out of a desire to destroy the BTS.") Signaling among competitors is also present, such as the "fend off the barbarians" comment, and, of course, other traditional facts suggestive of conspiracy, namely, the flat-out statements expressly stating that Plaintiffs were being blackballed by the court reporters. Detail in a complaint of "further circumstances pointing toward a meeting of the minds" allays the suspicion that the plaintiff is

---

conspiracy. *See JSW Steel (USA) Inc. v. Nucor Corp.*, No. 4:21-CV-01842, 2022 WL 489321, at *7 (S.D. Tex. Feb. 17, 2022) (discussing factors). In reviewing the evidence, it is important to remember that, while a plaintiff must show that the defendant joined an illegal agreement, it does not need to prove that the defendant was an instigator or a ringleader. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015).

merely speculating a conspiracy into existence from coincidentally similar action. *Twombly,* 550 U.S. at 557, 127 S. Ct. 1955. And, of course, these plus factors are to be considered by the "factfinder"—not on a motion to dismiss. *Royal Drug Co* 737 F.2d at 1437 (5th Cir. 1984).

## III.   The Texas Antitrust Act Claim Succeeds On The Same Basis As The Sherman Act Claim.

With respect to Plaintiffs' claim under the Texas Antitrust Act, it succeeds for the same reasons as the federal antitrust claim. "The Texas Antitrust Act is interpreted in harmony with federal interpretation of the Sherman Act." *Acad. of Allergy & Asthma in Primary Care v. Superior HealthPlan, Inc.*, SA-17-CA-1122-FB (HJB), at *22 n.9 (W.D. Tex. July 14, 2022) (citing *See Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992)). "Because Texas's antitrust laws mirror the Sherman Act, courts have recognized the appropriateness of relying on federal case law in examining state antitrust claims. Accordingly, it is not necessary to discuss Defendant's state claims separately." *Paramount Pictures Corporation v. Johnson Broadcasting Inc.*, Civil Action No. H-04-03488, at *3 n.1 (S.D. Tex. Feb. 15, 2006) (citing *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 687 (Tex. 1990)).

## IV.   Plaintiffs have Plead A Tortious Interference Claim.

With respect to the tortious interference claim, Plaintiffs have plead that as well.[11] Plaintiffs have specifically pled that they had contracts with each of the other Defendants (as well as with others), and a reasonable probability of entering into others. Complaint at ¶¶ 76-77. They have pled that the Defendants, including the TCRA, maliciously interfered with those contracts,

---

[11] To state a claim of tortious interference with contract under Texas law, a plaintiff must establish: "(1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred." *Udeigwe v. Texas Tech Univ.*, 2018 WL 2186485, at *4 (5th Cir. 2018) (quoting *Holloway v. Skinner*, 898 S.W.2d 793, 795-96 (Tex. 1995)). The elements of tortious interference with prospective relations are similar.

prevented the formation of new ones, had no privilege or justification for doing so, and that this conduct injured Plaintiffs. *Id.* at 78-79.  As far as the specifics of which Defendant was pressured, and how the contract was interfered with, those are the same facts that support Plaintiffs' antitrust claims, laid out in detail *supra.* Violations of the Sherman Act are certainly tortious acts, and the Court should not dismiss the tortious interference claim. *See Sanger Ins. Agency v. Hub Int'l, Ltd.,* 802 F.3d 732, 748 (5th Cir. 2015) (reversing the dismissal of a tortious interference and antitrust claim because "the merits of Sanger's antitrust claim . . . will ultimately determine whether it also has an actionable tortious interference claim" and "our resolution of these antitrust issues largely dictates our treatment of the . . . tortious interference with prospective business relations [claim.]").

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion for Summary Judgment, and grant Plaintiffs all further relief to which they are justly entitled.

Dated: August 17, 2023                               Respectfully submitted,

*/s/ Dov Preminger*
Dov Preminger
**Preminger PLLC**
State Bar No. 24098280
dov@premingerlaw.com
106 E 6th St. #900-211
Austin, TX 78701
Telephone: (512) 610-3503

**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 17, 2023, all counsel who are deemed to have consented to electronic service are being served with a copy of the foregoing document via the Court's CM/ECF system.  The following are being served by first class mail:

Greg Kohn,
Executive Manager
Speech to Text Institute, Inc.
16 Patterson Avenue
Titusville, NJ 08560

*/s/ Dov Preminger*
Dov Preminger